UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

FISH NORTHWEST,

            Plaintiff,

   v.

SCOTT RUMSEY[1]; CHRIS OLIVER;
NATIONAL MARINE FISHERIES
SERVICE; GINA RAIMONDO; and
UNITED STATES DEPARTMENT
OF COMMERCE,

            Defendants.

C21-570 TSZ

ORDER

     THIS MATTER comes before the Court on cross-motions for summary judgment,
docket nos. 62 and 64, filed by plaintiff Fish Northwest ("FNW") and defendants
National Marine Fisheries Service ("NMFS"), United States Department of Commerce,
and various individuals acting in their official capacities (collectively the "Defendants").
Having reviewed all papers filed in support of, and in opposition to, the motions, and

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Scott Rumsey, in his official capacity as Acting
Regional Administrator for NOAA Fisheries' West Coast Region, is hereby SUBSTITUTED for Barry
Thom as a defendant in this action. *See* Defs.' Mot. for Summ. J. (docket no. 64 at 1).

ORDER - 1

having determined that oral argument is unnecessary, the Court DENIES FNW's motion

for summary judgment and GRANTS the Defendants' cross-motion.

**Background**

**1.    The Endangered Species Act**

Congress enacted the Endangered Species Act ("ESA") to conserve endangered

species and to protect their critical habitats.  *See* 16 U.S.C. § 1531(b).  Under § 7(a)(2) of

the ESA, federal agencies (action agencies) must insure that any action they authorize,

fund, or carry out "is not likely to jeopardize the continued existence of any endangered

species or threatened species or result in the destruction or adverse modification" of

designated critical habitat.  *Id.* at § 1536(a)(2).

If a proposed federal action "may affect" a listed species or critical habitat, *see*

50 C.F.R. § 402.14(a), then the action agency must engage in formal consultation with a

consulting agency.  Formal consultation results in the consulting agency's issuance of a

Biological Opinion ("BiOp").  *Id.* at § 402.14(h).  A BiOp includes the consulting

agency's opinion on whether the action at issue is likely "to jeopardize the continued

existence of a listed species or result in the destruction or adverse modification of critical

habitat."  *Id.* at § 402.12(h)(1)(iv).

Section 9 of the ESA prohibits any "take" of a listed species.  16 U.S.C.

§ 1538(a)(1)(B); *see also id.* at § 1532(19) (defining "take" as to "harass, harm, pursue,

hunt, shoot, wound, kill, trap, capture, or collect," or to "attempt to engage in any such

conduct").  If a consulting agency determines that a proposed action is not likely to

jeopardize the continued existence of a listed species, but the action is reasonably certain

1 to result in a "take" of some listed species, the consulting agency provides an incidental

2 take statement ("ITS") along with the BiOp.  16 U.S.C. § 1536(b)(4); 50 C.F.R.

3 § 402.14(g)(7).  A "take" that occurs in compliance with an ITS is exempt from liability

4 under § 9.  16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i).

5 **2.    Factual Background**

6         Beginning in 2001, NMFS received, evaluated, and approved under § 4(d) of the

7 ESA a series of jointly developed resource management plans ("RMPs") from the

8 Washington Department of Fish and Wildlife ("WDFW") and the Puget Sound Treaty

9 Indian Tribes ("PSIT") (collectively the "co-managers").  ARf002756–57.  "These RMPs

10 provided the framework within which the tribal and state jurisdictions jointly managed all

11 recreational, commercial, ceremonial, subsistence and take-home salmon fisheries, and

12 steelhead gillnet fisheries impacting listed Chinook salmon within the greater Puget

13 Sound area."  AR2757.  The last of the RMPs approved by NMFS expired on April 30,

14 2014.  *Id.*

15         Since that time, NMFS has consulted under § 7 of the ESA on single-year actions

16 by the Bureau of Indian Affairs ("BIA"), the United States Fish and Wildlife Service

17 ("USFWS"), and NMFS.  AR2756–58.  "These consultations considered the effects of

18 Puget Sound salmon fisheries on listed species based on the general management

19 framework described in the 2010–2014 RMP as amended to address specific, annual

20 stock management issues."  AR2757.  In each year from 2014 to 2020, NMFS issued

21 one-year BiOps which considered BIA's, USFWS's, and NMFS's actions related to the

22 planning and authorization of Puget Sound fisheries.  *Id.*  The BiOps produced through

23

1   these formal consultations examined the effects of fishing on the listed Puget Sound

2   Chinook salmon Evolutionarily Significant Unit ("ESU"), the Puget Sound steelhead

3   Distinct Population Segment ("DPS"), the Southern Resident killer whale DPS, the

4   Mexico DPS of humpback whales, the Central America DPS of humpback whales, and

5   two listed Puget Sound rockfish DPSs.  AR2756–58.  Each year, the BiOps concluded

6   that the proposed fisheries "were not likely to jeopardize the continued existence of"

7   these listed species.  AR2757.

8          On April 26, 2021, BIA initiated formal consultation "on its authority to assist

9   with the development and implementation of the co-managers' 2021–2022 Puget Sound

10  Harvest Plan, and expenditure of funding to support implementation of federal court

11  decisions."  *Id.*  The request included a joint plan between the co-managers for the 2021–

12  2022 Puget Sound salmon and steelhead fisheries.  *Id.*  In addition to consultation on

13  BIA's authority to assist with the development of the co-managers' plan, NMFS also

14  considered some of its own actions as well as those carried out by USFWS.[2]  AR2760–

15  61.  After examining the effects of these proposed actions, NMFS concluded that the

16  actions were not likely to jeopardize the continued existence of the listed species,

17  including the Puget Sound Chinook salmon ESU, or adversely modify the species'

18

19  _____

20  [2] In the 2021 BiOp, NMFS considered three actions it proposed to take between May 1, 2021, and
    May 14, 2022.  AR2761.  Two of the actions concerned NMFS's role under the Pacific Salmon Treaty
21  ("PST") for Fraser Panel fisheries.  *Id.*  The third action was associated with its funding of activities by
    WDFW "for the implementation, management, and monitoring of Puget Sound fisheries, consistent with
22  the PST."  *Id.*  The Fraser Panel fisheries (sockeye and pink salmon) do not appear to be at issue in this
    case.  *See generally* Third Amended Complaint (docket no. 55).

23

ORDER - 4

1   designated critical habitat.  AR3046.  NMFS issued the 2021 BiOp along with an

2   incidental take statement.  AR3047.

3       On April 28, 2021, FNW filed its initial complaint in this action, challenging only

4   the 2020 BiOp because the 2021 BiOp had not yet been issued.  *See* Compl. (docket no.

5   1).  On August 13, 2021, FNW amended its complaint to challenge the 2021 BiOp as

6   well.  *See* Second Amended Complaint ("SAC") (docket no. 39).  On October 12, 2021,

7   the Court dismissed FNW's SAC for lack of standing.  Order at 11 (docket no. 53).  The

8   Court, however, granted FNW leave to file another amended complaint.  *Id.* at 19.  On

9   November 1, 2021, FNW filed its Third Amended Complaint ("TAC").[3]  *See* TAC

10  (docket no. 55).

11      FNW is a Washington non-profit corporation "committed to the conservation and

12  preservation of Puget Sound salmon and restoring and expanding fishing opportunities

13  for Washington's anglers."  TAC at ¶ 8.  The organization's members include individuals

14  who "enjoy fishing and care deeply about the conservation and recovery of Puget Sound

15  salmon" and businesses "that rely on salmon fisheries for Puget Sound salmon."  *Id.* at

16  ¶ 9.  FNW alleges that (i) NMFS violated ESA § 7(a)(2) by failing to ensure that its

17  actions in the 2021 BiOp do not jeopardize listed species, and (ii) the 2021 BiOp is

18  arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation

19  of the Administrative Procedure Act ("APA").  *See* TAC at ¶¶ 47–50.

20

21  [3] On November 1, 2021, FNW filed its TAC at docket no. 54.  After realizing that it had filed an incorrect
    version of the document, FNW filed a praecipe on November 3, 2021, docket no. 55, which contains the
22  operative version of its TAC.  *See* Praecipe (docket no. 55).

23

ORDER - 5

1   **<u>Discussion</u>**

2   **1.        Summary Judgment Standard**

3         The Court shall grant summary judgment if no genuine issue of material fact exists

4   and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ.

5   P. 56(a); *see also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir.

6   2012).  An agency's compliance with the ESA is reviewed under the APA.  *See Karuk*

7   *Tribe*, 681 F.3d at 1017.  "Judicial review pursuant to the APA is based solely on the

8   administrative record in existence at the time of the agency's decision."  *Ctr. for*

9   *Biological Diversity v. U.S. Env't Prot. Agency*, 90 F. Supp. 3d 1177, 1197 (W.D. Wash.

10  2015).  In a record review case, the Court may direct that summary judgment be granted

11  to either party based upon its review of the administrative record.  *See Karuk Tribe*, 681

12  F.3d at 1017.  A district court, however, may consider evidence outside the record "(1) if

13  admission is necessary to determine whether the agency has considered all relevant

14  factors and has explained its decision, (2) if the agency has relied on documents not in the

15  record, (3) when supplementing the record is necessary to explain technical terms or

16  complex subject matter, or (4) when plaintiffs make a showing of agency bad faith."  *Ctr.*

17  *for Biological Diversity*, 90 F. Supp. 3d at 1197 (quoting *Lands Council v. Powell*, 395

18  F.3d 1019, 1030 (9th Cir. 2005)).  These exceptions, although "widely accepted," must

19  be "narrowly construed and applied."  *Lands Council*, 395 F.3d at 1030.

20        "Under the APA, a court may set aside an agency action if the court determines

21  that the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in

22  accordance with law.'"  *Id.* (quoting 5 U.S.C. § 706(2)(A)).  Courts will "reverse a

23

1   decision as arbitrary and capricious only if the agency relied on factors Congress did not

2   intend it to consider, entirely failed to consider an important aspect of the problem, or

3   offered an explanation that runs counter to the evidence before the agency or is so

4   implausible that it could not be ascribed to a difference in view or the product of agency

5   expertise." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1074–75

6   (9th Cir. 2011) (citation omitted).  The Court's "review of agency actions, including the

7   promulgation of a BiOp, is narrow."  *See Alaska v. Lubchenco*, 723 F.3d 1043, 1052

8   (9th Cir. 2013).  The Court will typically accord "significant deference to an agency's

9   decisions that require a 'high level of technical expertise.'"  *See Ctr. for Biological*

10  *Diversity v. Bernhardt*, 982 F.3d 723, 740 (9th Cir. 2020) (quoting *Kleppe v. Sierra Club*,

11  427 U.S. 390, 412 (1976)).  The Court will be at its most deferential "when reviewing

12  scientific judgments and technical analyses within the agency's expertise."  *See Lands*

13  *Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010).

14  **2.   Article III Standing**

15        As an initial matter, the Defendants contend that FNW has failed to set forth facts

16  demonstrating its Article III standing.  Three elements are required to establish the

17  "irreducible constitutional minimum of standing:"

18        First, the plaintiff must have suffered an "injury in fact"—an invasion of a
19        legally protected interest which is (a) concrete and particularized and
        (b) actual or imminent, not conjectural or hypothetical.  Second, there must
20        be a causal connection between the injury and the conduct complained of—
        the injury has to be fairly traceable to the challenged action of the defendant,
21        and not the result of the independent action of some third party not before
        the court.  Third, it must be likely, as opposed to merely speculative, that the
        injury will be redressed by a favorable decision.

22

23

ORDER - 7

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations and quotations omitted).  As the party invoking federal jurisdiction, FNW bears the burden of establishing these elements.  *See id.* at 561.  "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."  *Id.* Thus, at the summary judgment stage, FNW must set forth, by affidavit or other evidence, specific facts to support its standing.  *See id.*  In this case, FNW has submitted three declarations which purportedly establish its standing to bring its claims.[4]

An organization can bring suit in federal court under two theories of standing:  by suing on (i) its own behalf, or (ii) on behalf of its members.  FNW alleges that it has standing to bring its claims on its own behalf and on behalf of its members.  TAC at ¶¶ 25–26.  "The same three-part analysis used to determine whether an individual has standing (injury in fact, causation, and redressability) is used to determine whether an organization has standing to sue on its own behalf."  *Ctr. for Env't. Sci. Accuracy &*

---

[4] FNW filed two of the three declarations in response to the Defendants' motion to dismiss, docket no. 46. Specifically, FNW submitted declarations from members Barry Allyn and Art Tachell, docket nos. 48 and 49, in response to the prior motion.  Because the Defendants raised a facial challenge to the Court's subject matter jurisdiction, the Court declined to consider the declarations at that time.  *See* Order at 10 (docket no. 53); *see also Ctr. for Biological Diversity v. Bernhardt*, No. 19-cv-05206, 2020 WL 4188091, at *5 n.4 (N.D. Cal. May 18, 2020) (declining to review similar declarations in the context of a facial challenge).  But the procedural posture of this case has changed, and the Court is now faced with cross-motions for summary judgment.  The Court, therefore, will consider the Allyn and Tachell declarations for the issue of standing.  FNW has also submitted a declaration from member Curt Smitch that addresses standing.  *See* Smitch Decl. (docket no. 67).  The Defendants' move to strike docket no. 67 and contend that FNW improperly submitted the declaration for the first time in support of its reply brief.  FNW, however, properly submitted the declaration in support of its combined response and reply brief after the Defendants again challenged FNW's standing to bring its claims.  The Court DENIES the Defendants' motion to strike the Declaration of Curt Smitch, docket no. 67, and will consider the declaration only when evaluating FNW's standing.

1   *Reliability v. Nat'l Park Serv.*, No. 14-cv-02063, 2016 WL 4524758, at *19 (E.D. Cal.

2   Aug. 29, 2016) (citing *La Asociacion de Trabajadores de Lake Forest v. City of Lake*

3   *Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)).  To establish that it suffered an injury in

4   fact, FNW must demonstrate "both a diversion of its resources and a frustration of its

5   mission."  *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002).  FNW

6   alleges that it has diverted resources in the "form of the time and effort of its board of

7   directors and in expenditures of money to attempt to influence [the Defendants'] fishery

8   policies," and that its "purpose of conservation and preservation of Puget Sound salmon,

9   along with expanding fishing opportunities, have been frustrated by [the Defendants']

10   actions." TAC at ¶ 25.  These allegations in its TAC are insufficient to establish FNW's

11   standing at this phase of the proceeding.  The declarations FNW has submitted fail to

12   demonstrate, or even address, a diversion of resources or a frustration of the

13   organization's mission.  *See* Allyn Decl. (docket no. 48); Tachell Decl. (docket no. 49);

14   Smitch Decl. (docket no. 67).  Accordingly, FNW has failed to present, by declaration or

15   other evidence, specific facts necessary to establish standing to sue on its own behalf.

16        The Court, however, concludes that FNW has adequately demonstrated standing to

17   sue on behalf of its members.  An organization has standing to sue on behalf of its

18   members when "(a) its members would otherwise have standing to sue in their own right;

19   (b) the interests it seeks to protect are germane to the organization's purpose; and

20   (c) neither the claim asserted nor the relief requested requires the participation of

21   individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432

22

23

U.S. 333, 343 (1977).  The Court concludes that FNW meets the last two criteria,[5] and

turns to whether FNW has demonstrated that its members would otherwise have standing

to sue in their own right.

### a.   Injury in Fact

In environmental cases, the injury in fact requirement "is satisfied if an individual

adequately shows that she has an aesthetic or recreational interest in a particular place, or

animal, or plant species and that that interest is impaired by a defendant's conduct."

*Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000).

FNW has submitted declarations from three of its members describing alleged

recreational injuries.  Specifically, Barry Allyn was raised "along the North Fork of the

Stillaguamish River and developed a passion for fishing and the outdoors beginning at

age six."  Allyn Decl. at ¶ 2.  Allyn "care[s] deeply about habitat and salmon

conservation" and started salmon fishing in Puget Sound as a young adult.  *Id.* at ¶¶ 3 &

7.  Allyn has experienced "reduced opportunity" for recreational fishing in recent years.

*Id.* at ¶ 5.  Similarly, Art Tachell has been fishing recreationally in Puget Sound for 60

years.  Tachell Decl. at ¶ 2.  Tachell also "care[s] deeply about Puget Sound

salmon . . . and the conservation and recovery of Puget Sound salmon" and has been

involved in "many conservation projects aimed at" salmon recovery.  *Id.* at ¶¶ 2 & 5.

Finally, Curt Smitch previously served as the president of FNW.  Smitch Decl. at ¶ 2.

---

[5] FNW is a non-profit organization that was "founded in 2005 to promote recreational fishing opportunity
and salmon conservation."  Smitch Decl. at ¶ 3.  The interests at stake in this action are germane to the
FNW's purpose and the participation of individual members is not required.

1   Smitch fishes recreationally in Puget Sound and has "spent years working on fishery

2   issues . . . to reform fisheries to be more selective and enable the recovery of wild

3   salmonids in Puget Sound and Washington." *Id.*  Smitch is "regularly" in contact with

4   members of the Washington legislature "to advocate for fisheries improvements and

5   recovery."  Smitch believes that "[i]f Puget Sound Chinook were recovered, there would

6   be far more opportunity for fisheries (both tribal and non-tribal)." *Id.* at ¶ 4.

7         The Defendants argue that FNW's members are concerned primarily with

8   "reallocation of the treaty and non-treaty salmon harvest," *see* Defs.' Mot. for Summ. J.

9   (docket no. 64 at 16), and provide no clear articulation as to how their interests are

10  harmed by the 2021 BiOp.  The Court recognizes that none of the proffered declarations

11  specifically reference the 2021 BiOp.  Although reference to the challenged BiOp would

12  provide further support for the members' alleged injuries, the members need not do so to

13  demonstrate that they have suffered the requisite recreational injuries.  The Defendants'

14  argument ignores that FNW brings this action for NMFS's alleged failure to ensure no

15  jeopardy to Puget Sound salmon, *see* TAC at ¶ 16, which purportedly results in the

16  declining salmon populations that Allyn, Tachell, and Smitch hope to recover.  The Court

17  concludes that the declarations of Allyn, Tachell, and Smitch, docket nos. 48, 49, and 67,

18  provide specific facts concerning the members' imminent and concrete recreational

19  injuries sufficient to establish injury in fact.

20        **b.     Causation and Redressability**

21        The Court similarly concludes that FNW has sufficiently established causation and

22  redressability.  "The 'fairly traceable' and 'redressability' components for standing

23

ORDER - 11

overlap and are 'two facets of a single causation requirement.'" *Ctr. for Biological Diversity*, 90 F. Supp. 3d at 1189 (citing *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1146 (9th Cir. 2013)). "The two are distinct insofar as causality examines the connection between the alleged misconduct and injury, whereas redressability analyzes the connection between the alleged injury and requested judicial relief." *Id.*

The causation inquiry focuses on "whether the alleged injury can be traced to the defendant's challenged conduct, rather than to that of some other actor not before the court." *Ecological Rights Found.*, 230 F.3d at 1152. FNW must show that its members' alleged injuries are "causally linked" to the Defendants' alleged misconduct. *See Wash. Env't Council*, 732 F.3d at 1141. The causal link "cannot be too speculative or rely on conjecture about the behavior of other parties, but need not be so airtight at this stage of litigation as to demonstrate that the plaintiffs would succeed on the merits." *Ocean Advocs. v. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2005) (quoting *Ecological Rights Found.*, 230 F.3d at 1152). To meet the redressability requirement, FNW must demonstrate that "it is likely, even if not necessarily certain, that [its] injury can be redressed by a favorable decision." *See Ctr. for Biological Diversity*, 90 F. Supp. 3d at 1189 (citing *Bonnichsen v. United States,* 367 F.3d 864, 873 (9th Cir. 2004)).

The Defendants contend that FNW's members are concerned primarily with their share of the Puget Sound salmon harvest and fail to explain how FNW's requested judicial relief will lead to increased recreational harvest. The Defendants again ignore that FNW brings this action for the agency's alleged failure to ensure no jeopardy to Puget Sound salmon. *See* TAC at ¶ 16. NMFS concluded that the co-managers' 2021–

1    2022 salmon fisheries were not likely to jeopardize the continued existence of the Puget

2    Sound Chinook salmon ESU at issue in this case.  AR3046–47.  Having concluded that

3    the proposed actions would not jeopardize the continued existence of the species, NMFS

4    issued an ITS.  AR3047.  As discussed above, any "take" that occurs in compliance with

5    an ITS is exempt from liability under § 9 of the ESA.  16 U.S.C. § 1536(o)(2); 50 C.F.R.

6    § 402.14(i).  Although NMFS is not involved in the allocation of the Chinook salmon

7    harvest among state and tribal authorities, and does not take any of the listed salmon for

8    itself, it is involved in the legal framework that permits state and tribal authorities to

9    conduct certain salmon fisheries in compliance with the ESA.  Because NMFS's finding

10   of "no jeopardy" purportedly harms the members' conservation interests in the listed

11   salmon, the Court concludes that FNW has sufficiently established a "causal link"

12   between the members' recreational injury and NMFS's agency action.

13          FNW has also demonstrated that its members' alleged injuries could likely be

14   redressed by a favorable decision.  For reasons related to mootness, discussed below,

15   FNW's requested relief would be limited in the event it received a favorable decision.

16   The Court, for example, could not set aside a BiOp that has already expired.  A favorable

17   decision, however, could result in NMFS's consideration of the factors FNW alleges it

18   routinely ignores when consulting on agency action year after year.  Because FNW's

19   members would otherwise have standing to sue in their own right, the Court concludes

20   that FNW has standing to brings its claims on their behalf.

21

22

23

1    **3.      Mootness**

2          Next, the Defendants contend that FNW's challenge to the 2021 BiOp is

3    constitutionally moot; the 2021 BiOp expired on May 14, 2022, before briefing in this

4    matter concluded.  AR2735 ("This biological opinion and [essential fish habitat]

5    consultation expire on May 14, 2022.").  "A claim is moot if it 'has lost its character as a

6    live controversy.'"  *All. for the Wild Rockies v. Savage*, 897 F.3d 1025, 1031 (9th Cir.

7    2018) (quoting *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 590 F.3d 725, 727 (9th

8    Cir. 2009)).  FNW implicitly acknowledges that the case is moot because it argues only

9    that its challenge falls under the "capable of repetition, yet evading review" exception to

10   the mootness doctrine.  "The exception applies only where '(1) the duration of the

11   challenged action is too short to allow full litigation before it ceases, and (2) there is a

12   reasonable expectation that the plaintiffs will be subjected to it again.'"  *Biodiversity*

13   *Legal Found. v. Badgley*, 309 F.3d 1166, 1173 (9th Cir. 2002) (quoting *Greenpeace*

14   *Action v. Franklin,* 14 F.3d 1324, 1329 (9th Cir. 1993)).  For example, in *Greenpeace*

15   *Action*, the Ninth Circuit held that a fishing regulation in effect for less than one year

16   satisfied the durational component.  14 F.3d at 1329–30.  Although the Ninth Circuit has

17   consistently held that challenges to superseded BiOps are moot and do not evade review,

18   the new BiOps at issue in those cases often span more than one year, leaving plaintiffs

19   with sufficient opportunity to challenge the agency action.[6]  Because the 2021 BiOp at

20

21   [6] *See, e.g.*, *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1124 (9th Cir. 1997) ("[Plaintiff's]
     challenge to the 1994–1998 Biological Opinion will not evade review because the 1995 Biological
22   Opinion will not expire until 1998."); *Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 56
     F.3d 1071, 1075 (9th Cir. 1995) ("[T]he 1993 [BiOp] was not followed by a [BiOp] of similarly short

23

ORDER - 14

issue in this case was in effect for only one year, the duration of the BiOp was too short

to allow for full litigation before its expiration.  Although the Defendants have made a

strong showing that FNW's challenge to the 2021 BiOp is moot, the Court concludes that

the durational element of the "capable of repetition, yet evading review" exception is

satisfied.[7]

The second element of the exception "requires a probability that the challenged

action will affect [FNW] in the future."  *See Biodiversity Legal Found.*, 309 F.3d at 1174.

The Court concludes that this element is also satisfied.  Every year since 2014, NMFS

has issued one-year BiOps that examine the effects of fishing on the listed Puget Sound

Chinook salmon ESU.[8]  AR2756–58.  NMFS is expected to issue another BiOp of

equally short duration "that will likely cover the same agency actions in 2022–23," *see*

Defs.' Mot. for Summ. J. (docket no. 64 at 18), and the procedural history of this case

demonstrates that the challenged action will likely affect FNW in the future.  When FNW

---

duration; it was followed by the 1994–1998 [BiOp].");  *Grand Canyon Tr. v. Bureau of Reclamation*, 691 F.3d 1008, 1017 (9th Cir. 2012) (holding that a plaintiff's challenge to a 2009 BiOp and 2010 ITS was moot because a 2011 BiOp and 2011 ITS, which were issued after the plaintiff filed its notice of appeal, superseded the earlier documents and purported to "cover the operation of the Dam through 2020").

[7] The prudent administration of justice supports the Court's consideration of the merits in this case. Further, FNW's alleged delay in moving for summary judgment did not foreclose the possibility of judicial review before the 2021 BiOp expired.  As the Ninth Circuit has explained, "evading review" means that the "underlying action is almost certain to run its course before either [the Ninth Circuit] or the Supreme Court can give the case full consideration." *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 855 (9th Cir. 1999) (citation omitted); *see also Biodiversity Legal Found.*, 309 F.3d at 1173–74 ("In sum, an issue that 'evades review' is one which, in its regular course, resolves itself without allowing sufficient time for appellate review.").  Although FNW could have moved for summary judgment a few months earlier than it did, appellate review in this action would not have been possible before the BiOp expired.

[8] In 2016, NMFS issued three BiOps related to the 2016–2017 Puget Sound fisheries.  AR2757.

ORDER - 15

1  commenced this action on April 28, 2021, it challenged only the 2020 BiOp as the 2021

2  BiOp was not issued until May 2021.  *See* Compl. (docket no. 1).  On August 13, 2021,

3  FNW filed its SAC challenging the same analyses and conclusions in both the 2020 and

4  2021 BiOps.[9]  FNW can be reasonably expected to again litigate this matter if NMFS

5  issues a similar BiOp for 2022–2023, as the agency has done every year since 2014.

6  Thus, the Court concludes that it has jurisdiction to review this matter because FNW has

7  satisfied both elements of the "capable of repetition, yet evading review" exception to the

8  mootness doctrine.

9  **4.      Merits of FNW's Challenge to the 2021 Biological Opinion**

10      **a.      First Cause of Action Under ESA § 7(a)(2)**

11      The Defendants assert that the Court cannot adjudicate FNW's claim against

12  NMFS under § 7(a)(2) of the ESA because FNW failed to provide the required sixty-day

13  notice that NMFS's actions in the 2021 BiOp allegedly violate the ESA.  A plaintiff may

14  not commence an action under the citizen-suit provision of the ESA without first

15  providing written sixty-day notice of any alleged violations.  16 U.S.C. § 1540(g)(2)(A).

16  The notice is a jurisdictional requirement for commencing an action under the ESA.  *Sw.*

17  *Ctr. for Biological Diversity v. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998)

18  ("A failure to strictly comply with the notice requirement acts as an absolute bar to

19

20  ——————————————————

21  [9] The Court previously dismissed FNW's challenge to the 2020 BiOp as moot.  *See* Order at 11–13
     (docket no. 53).  The Court concluded that FNW's challenge to the 2020 BiOp did not evade review
22  because FNW challenged the same analyses and conclusions in the 2021 BiOp that it sought to challenge
     in the 2020 opinion.  *Id.*

23

ORDER - 16

1  bringing suit under the ESA.").  The notice must provide sufficient information to allow

2  an agency to identify the alleged violations and give the agency an opportunity to correct

3  the violations, *id.* at 522, but need not "list every specific aspect or detail of every alleged

4  violation," *Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645, 651 (9th Cir.

5  2015) (internal quotations and citations omitted).

6         To be clear, the sixty-day notice requirement does not apply to FNW's claim that

7  NMFS's 2021 BiOp is arbitrary and capricious under the APA.  In *American Rivers v.*

8  *National Marine Fisheries Service*, the Ninth Circuit held that the issuance of a BiOp is a

9  final agency action, properly challenged under the APA as opposed to the ESA's citizen

10  suit provision.  126 F.3d at 1124–25.  An alleged failure to comply with the sixty-day

11  notice requirement will not deprive the court of jurisdiction over FNW's claim under the

12  APA.

13         The notice requirement, however, applies to FNW's claim that NMFS violated

14  § 7(a)(2) of the ESA by failing to ensure that its actions identified in the 2021 BiOp do

15  not jeopardize listed species.  On January 29, 2021, FNW provided NMFS notice of its

16  intent to sue under the ESA.  *See* Notice (docket no. 39 at 19–49).  The Defendants

17  contend that FNW failed to provide notice that NMFS's own actions in the 2021 BiOp

18  (regulating the Fraser Panel sockeye and pink salmon fisheries and providing funding to

19  WDFW for activities such as fishery monitoring and sampling) violate the ESA.  Indeed,

20  FNW initially commenced this action to challenge the 2020 BiOp and amended its

21  complaint to also challenge the 2021 BiOp after NMFS issued the opinion in May 2021.

22  Having review the notice, the Court agrees that FNW failed to address these actions.

23

Moreover, in its TAC, FNW does not allege that NMFS's own actions in the 2021 BiOp related to the Fraser Panel fisheries and funding for fishery monitoring violate § 7(a)(2) of the ESA, and FNW did not specifically address these actions in its motion for summary judgment.  FNW's arguments focus on the 2021 BiOp as it relates to NMFS's conclusion that the co-managers' 2021–2022 fisheries are not likely to jeopardize the continued existence of the Puget Sound Chinook salmon ESU.  As discussed above, NMFS considered the co-managers' fisheries in its role as a consulting agency after BIA (the action agency) requested formal consultation "on its authority to assist with the development and implementation of the co-managers' 2021–2022 Puget Sound Harvest Plan, and expenditure of funding to support implementation of federal court decisions." *See* AR2757.  To the extent it is trying to do so, FNW cannot claim that NMFS violated the ESA by issuing the 2021 BiOp in its consultation role.  *See Bennett v. Spear*, 520 U.S. 154, 174 (1997) (Section 1540(g)(1)(A)'s "reference to any 'violation' of the ESA" does not include "any errors on the part of the Secretary in administering the ESA.").

Therefore, FNW's claim that NMFS violated § 7(a)(2) of the ESA by failing to ensure that its actions identified in the 2021 BiOp do not jeopardize listed species is DISMISSED for lack of notice.

### b.    Second Cause of Action Under the APA

Under § 7(a)(2) of the ESA, NMFS evaluates whether proposed actions are "*likely to jeopardize the continued existence of* any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2) (emphasis added).  The phrase "jeopardize the continued existence of"

means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.  According to the Ninth Circuit, to "'jeopardize' . . . means to 'expose to loss or injury' or to 'imperil.'  Either of these implies causation, and thus some new risk of harm. . . .  Agency action can only 'jeopardize' a species' existence if that agency action causes some deterioration in the species' pre-action condition." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 929–30 (9th Cir. 2008). Therefore, when reviewing FNW's challenge to the 2021 BiOp under the APA, the Court must determine if NMFS considered whether the proposed actions at issue reduce appreciably the likelihood of both survival and recovery of listed salmon.[10]

Under the APA, FNW makes three basic challenges to the 2021 BiOp, arguing that the 2021 BiOp fails to ensure no jeopardy because it:  (i) "authorizes the harvest of listed salmon at a rate that exceeds the maximum rate of harvest that can occur without jeopardizing the existence of the listed species"; (ii) "fails to coordinate harvest with

---

[10] The Defendants' motion to strike the other declaration of Curt Smith, docket no. 63, is GRANTED.  In addition to the declaration regarding standing, docket no. 67, addressed above, FNW also submitted a declaration from Smitch in support of its claims under the APA.  In this case, all factors weigh in favor of striking the declaration, which only discusses the Puget Sound Salmon Management Plan ("PSSMP") between state and tribal authorities.  *See Lands Council*, 395 F.3d at 1030.  Even if the Court considered the declaration, it would still conclude that FNW's challenge to the 2021 BiOp under the APA lacks merit.  The declaration argues generally that compliance with the PSSMP would improve inequities in the salmon harvest between state and tribal authorities and disincentivize the overharvest of listed salmon. *See* Smith Decl. at ¶¶ 14–15 (docket no. 63).  The declaration does not support that NMFS "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *See N. Plains Res. Council*, 668 F.3d at 1074–75.

1   hatchery genetic management"; and (iii) "fails to account for the increased risk of single-

2   year fisheries authorizations."  Pl.'s Mot. for Summ. J. (docket no. 62 at 3).  All three

3   arguments lack merit.

### i.     Rebuilding Exploitation Rates

5       FNW argues that NMFS failed to ensure no jeopardy to Puget Sound Chinook

6   because the 2021 BiOp allegedly authorized harvest that exceeds the rebuilding

7   exploitation rate ("RER") NMFS "determined as the maximum allowable rate without

8   producing jeopardy."  *Id.* (docket no. 62 at 27).  FNW's contention conflates species and

9   population levels.  NMFS is required to make a jeopardy determination at the *species*

10   *level*, rather than the individual population level.  16 U.S.C. § 1532(16) ("The term

11   'species' includes any subspecies of fish or wildlife or plants, and any distinct population

12   segment of any species of vertebrate fish or wildlife which interbreeds when mature.");

13   *see also Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 913 (9th Cir. 2012) ([T]he

14   "standard under Section 7(a)(2) of the ESA is whether the agency action would

15   'jeopardize the continued existence' of the species as a whole.").

16       To determine whether the proposed harvest actions would appreciably reduce the

17   survival and recovery of the Puget Sound Chinook salmon ESU, which comprises 22

18   populations spread across five different regions, NMFS considered population-specific

19   exploitation rates, or RERs, that if met would provide a "high probability of attaining

20   escapement levels which will maximize the natural production for each population (the

21   rebuilding escapement threshold) and a low probability of escapements falling below

22   levels at which the population may become unstable (the critical escapement threshold)

23

due to effects of fisheries." [11]  AR2911 & AR3019.  "When the exploitation rate from a proposed fishery is likely to be at or below the RER, that results in reasonable confidence that the likely effects of the fisheries pose a low risk to that population."  AR2912.  As NMFS explains:

> Comparison of the RERs to the results of the proposed action establishes an initial map of risk across the populations in the Puget Sound Chinook salmon ESU.  However, it is not the only consideration in our overall jeopardy assessment, under the ESA.  Our analysis also accounts for many other variables, both at the population and the region and ESU levels.  That information, together with the rest of the information described below informs NMFS's determination as to whether the proposed action would jeopardize the ESU. As detailed in the sections below, the RER analysis together with these additional elements can provide meaningful context for the potential effects to the specific populations. Collectively it informs NMFS's determination as to whether the proposed action would jeopardize the ESU, as well as the recovery of the ESU, as a whole. The jeopardy determination is made on the ESU, not based on effects to an individual population.

*Id.*  RERs, however, are only one metric that NMFS uses in its analysis.  *Id.*  "NMFS uses a variety of quantitative metrics (e.g., RERs, critical and rebuilding thresholds, measures of growth rate and productivity) and qualitative considerations . . . in its assessment of the proposed actions."  AR3019.  "None of these factors in isolation are dispositive or dictate a particular conclusion.  They are all factors that inform NMFS's conclusions with respect to the ESU and are considered comprehensively."  *Id.*  The 2021 BiOp shows that

---

[11] "The rebuilding threshold is defined as the escapement that will achieve Maximum Sustainable Yield ("MSY") under current environmental and habitat conditions."  AR2780.  "[T]he critical escapement threshold is defined as a point below which: (1) depensatory processes are likely to reduce the population below replacement; (2) the population is at risk from inbreeding depression or fixation of deleterious mutations; or (3) productivity variation due to demographic stochasticity becomes a substantial source of risk."  AR2912.

1   NMFS considered many variables and did not use RERs, which are *population*, rather

2   than *species*, related statistics, as a single jeopardy threshold for the purposes of its

3   analysis under the ESA.  *See* AR2912.

4       Despite FNW's argument to the contrary, NMFS thoroughly considered why

5   exceedances of RERs for certain populations are not likely to jeopardize the continued

6   existence of the Puget Sound Chinook ESU.  *See*, *e.g.*, AR3018–26.  For example, FNW

7   alleges that the Duwamish-Green River Chinook population are harvested at a rate that

8   exceeds the RER by 221%.[12]  Pl.'s Mot. for Summ. J. (docket no. 62 at 22).  But NMFS

9   specifically addressed the risks associated with exceeding the RER.  As the 2021 BiOp

10  explains:

11      The risks associated with exceeding the RER in the 2021 fishing year should
        not impede achievement of viability by the Nisqually, Puyallup or Green,
12      Sammamish, and Cedar River populations. . . . Natural-origin returns for the
        Green River have substantially increased in recent years and the population
13      will be managed in 2021 to ensure that the gains are preserved, maintaining
        the abundance with additional opportunities to strengthen the trend.  Growth
14      rates for natural-origin escapement are consistently higher than growth rates
        for natural origin recruitment in the Green River.  This indicates that
15      sufficient fish are escaping the fisheries to maintain or increase the number
        of spawners from the parent generation, providing some stabilizing influence
16      for abundance and reducing demographic risks.

17  AR3021.[13]  Based on its review of the available evidence, NMFS concluded that the

18  proposed harvest actions would not reduce appreciably the likelihood of both the survival

19  _____

20  [12] How FNW reached this figure is unclear.  The 2021 BiOp lists the estimated exploitation rate for the
    Duwamish/Green River Chinook population for ocean and Puget Sound at 54.7%.  *See* Table 23,
21  AR2919.

22  [13] *See also* AR2932 (explaining that anticipated escapement in 2021 for the Duwamish-Green River
    Chinook population is just below the rebuilding threshold and well above the critical threshold, and that

23

1    and recovery of the Puget Sound Chinook ESU.  *See* 50 C.F.R. § 402.02.  FNW's

2    argument that NMFS misused and/or misapplied RERs is not supported by the record.

3                   **ii.       Hatchery and Natural Origin Salmon**

4           FNW also argues that NMFS's "analysis fails to differentiate between hatchery

5    and natural origin salmon, and NMFS treats the two as interchangeable."  Pl.'s Mot. for

6    Summ. J. (docket no. 62 at 27).  FNW alleges that NMFS "ignores any distinction

7    between hatchery fish and natural origin fish" to support its conclusion that long-term

8    abundance trends and recruitment of natural origin salmon are positive.  *Id.* (docket

9    no. 62 at 18); *see also* AR2783.  The Defendants label this argument as "mystifying," and

10   explain that NMFS includes "both natural origin spawners and hatchery origin fish

11   spawning naturally to assess the total number of spawners passed through the fishery to

12   the spawning ground" when it evaluates the recruits-to-spawners ("R/S") metric.

13   AR2784 (Table 6 n.1).  The R/S metric is used to estimate long-term trends in a

14   population's status by evaluating how many juveniles (recruits) are produced from an

15   adult (spawner).  *See id.*  As the Defendants explain, "[h]atchery-origin fish that spawn

16   naturally will produce juveniles that are not raised in a hatchery, i.e., naturally, and thus

17   these recruitment estimates are included in the dataset for this specific metric."  Defs.'

18   Mot. for Summ. J. (docket no. 64 at 26).  FNW argues that "settled science" indicates

19   "hatchery fish are less effective at spawning in the wild" when compared to natural origin

20

21   _____

22   anticipated total returns in 2021 are expected to be consistent with 2016, 2017, and 2018, which all
     resulted in higher than expected returns).

23

1   fish, *see* Pl.'s Mot. for Summ. J. (docket no. 62 at 19) (citing AR49128), and contends

2   that NMFS provided no analysis of the risk of considering hatchery and natural origin

3   salmon as interchangeable.

4      The portion of the record cited by FNW in support of this argument merely shows

5   how NMFS calculated a particular metric.  *See* AR2784.  Further, NMFS considered the

6   effects of hatchery fish in detail in the 2021 BiOp.  *See, e.g.*, AR2870–78.  NMFS

7   recognized that hatcheries might provide benefits to the status of Puget Sound Chinook

8   and steelhead by "reducing demographic risks and preserving genetic traits for

9   populations at low abundance in degraded habitats," and that hatchery-origin fish can

10   increase harvest opportunity.  AR2870.  NMFS also considered the risks associated with

11   hatchery-origin fish, such as their "genetic, ecological, or harvest effects."  *Id.*  FNW's

12   arguments in its motion for summary judgment are nothing more than arguments, and the

13   record reflects a careful analysis of the effects of hatchery-origin fish on the Puget Sound

14   Chinook salmon ESU.  FNW's argument that NMFS failed to differentiate between

15   hatchery and natural origin salmon is not supported by the record.  Like its first

16   argument, FNW's second argument also lacks merit.

17        **iii.**   **Single-Year-Fishery Authorizations**

18      Finally, FNW alleges that NMFS failed to consider the risk of single-year-fishery

19   authorizations in the 2021 BiOp.  Pl.'s Mot. for Summ. J. (docket no. 62 at 28).

20   According to FNW, the 2021 BiOp does not contain any "mitigation, explanation, or

21   analysis" regarding this issue.  *Id.*  FNW is mistaken.  The 2021 BiOp does "address

22   specific, annual stock management issues," AR2757, and considers the long-term effects

23

ORDER - 24

of single-year authorizations, *see* AR3026.  FNW has not demonstrated that NMFS

ignored the potential risk of yearly fishery authorizations.

Throughout its motion, FNW disputes NMFS's scientific conclusions but it has

not demonstrated that NMFS ignored particular issues in its analysis.  FNW has not

shown that NMFS "relied on factors Congress did not intend it to consider, entirely failed

to consider an important aspect of the problem, or offered an explanation that runs

counter to the evidence before the agency or is so implausible that it could not be

ascribed to a difference in view or the product of agency expertise."  *N. Plains Res.*

*Council*, 668 F.3d at 1074–75.  As the record reflects, NMFS provided reasonable

explanations supporting its conclusions in this highly technical and complex area.

Without more, the Court will not second-guess NMFS's scientific judgment that the

proposed actions it considered in the 2021 BiOp were unlikely to reduce appreciably the

likelihood of both the survival and recovery of the listed species it analyzed in the

opinion.  AR3026.  NMFS's analysis is unquestionably within the agency's expertise.

*See Lands Council*, 629 F.3d at 1074.  FNW has failed demonstrate that the 2021 BiOp is

arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law.

## Conclusion

For the foregoing reasons, the Court ORDERS:

(1)    Pursuant to Rule 25(d), Scott Rumsey, in his official capacity as Acting

Regional Administrator for NOAA Fisheries' West Coast Region, is hereby

SUBSTITUTED for Barry Thom as a defendant in this action, and the Clerk is

DIRECTED to amend the caption accordingly;

1    (2)     The Defendants' motion, docket no. 64 at 10 n.5, to strike the Declaration

2  of Curt Smitch, docket no. 63, is GRANTED, and their motion, docket no. 69 at 6 n.2, to

3  strike the Second Declaration of Curt Smitch, docket no. 67, is DENIED;

4    (3)     The Defendants' motion for summary judgment, docket no. 64, is

5  GRANTED.  FNW's first cause of action under § 7(a)(2) of the ESA is DISMISSED for

6  lack of notice and its second cause of action under the APA is DISMISSED with

7  prejudice;

8    (4)     FNW's motion for summary judgment, docket no. 62, is DENIED; and

9    (5)     The Clerk is DIRECTED to enter judgment consistent with this Order, to

10  send a copy of the Judgment and this Order to all counsel of record, and to CLOSE this

11  case.

12    IT IS SO ORDERED.

13    Dated this 25th day of July, 2022.

Thomas S. Zilly
United States District Judge

ORDER - 26